**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CMP DEVELOPMENT, LLC, | ) | |
| | ) | C.A. No. 21-549-MN |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMNEAL PHARMACEUTICALS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF CMP DEVELOPMENT, LLC'S**
**REPLY POST TRIAL BRIEF**


OF COUNSEL:

Christopher J. Sorenson
Paige Stradley
MERCHANT & GOULD PC
150 South Fifth St., Suite 2200
Minneapolis, MN 55402
(612) 332-5300

Andrew O. Larsen
MERCHANT & GOULD PC
767 Third Avenue, Suite 23C
New York, NY 10017
(212) 223-6520

Kelly E. Farnan (#4395)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
cragg@rlf.com

*Attorneys for Plaintiff*
*CMP Development, LLC*


Dated: March 13, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

TABLE OF ABBREVIATIONS ..... iii

I. INTRODUCTION ..... 1

II. THE PROPOSED ANDA PRODUCT INFRINGES THE ASSERTED PATENTS ..... 1

A. Dr. Jonnalagadda's Opinions were Based on a Reliable Methodology Applied to Amneal's Analytical Data ..... 1

B. Amneal Repeatedly Mischaracterizes the Record Concerning Dr. Jonnalagadda's Testimony ..... 2

C. Dr. Jonnalagadda's Testimony Was Not the Only Evidence of Infringement ..... 5

D. The Amount of Tragacanth Used By Amneal is Equivalent to the Claimed Amount of Xanthan ..... 6

III. AMNEAL HAS NOT SHOWN THAT CMP IS BARRED FROM ASSERTING THE DOCTRINE OF EQUIVALENTS ..... 7

A. CMP Did Not Make Arguments During Prosecution That Clearly and Unmistakably Disavowed the Use of Tragacanth ..... 7

B. The Asserted Claims Were Not Drafted Narrowly to Exclude Tragacanth ..... 9

C. Ample Evidence Rebuts Amneal's Ensnarement Theory ..... 11

IV. CONCLUSION ..... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amgen Inc. v. Amneal Pharms. LLC*,
945 F.3d 1368 (Fed. Cir. 2020)....................13

*Amgen Inc. v. Coherus BioSciences Inc*.,
931 F.3d 1154 (Fed. Cir. 2019)....................8, 9, 13

*Bayer AG v. Elan Pharm. Research Corp*.,
212 F.3d 1241 (Fed. Cir. 2000)....................1

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
460 F.3d 1349, 1364 (Fed. Cir. 2006)....................7

DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,
567 F.3d at 1314 ....................12, 14

*Impax Labs., Inc. v. Lannett Holdings Inc*.,
246 F. Supp. 3d 1024 (D.Del. Mar. 29, 2017) ....................14

*Jang v. Boston Sci. Corp*.,
872 F.3d 1275 (Fed. Cir. 2017)....................15

*Takeda Chem. v. Mylan Labs, Inc*.,
549 F.3d 1381 (Fed. Cir. 2008)....................13

*UCB, Inc. v. Watson Lab'ys Inc*.,
927 F.3d 1272 (Fed. Cir. 2019)....................8, 9, 11

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
683 F.3d 1356 (Fed. Cir. 2012)....................9, 10

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
|---|---|
| ’906 patent | U.S. Patent No. 10,624,906 |
| ’907 patent | U.S. Patent No. 10,660,907 |
| ’570 patent | US. Patent No. 10,888,570 |
| “Amneal” or “Defendant” | Amneal Pharmaceuticals LLC |
| Asserted Claims | Claims 1 and 8 of the ’906 patent; Claims 1 and 10 of the ’907 patent; claims 1 and 7-10 of the ’570 patent. |
| ANDA | Abbreviated New Drug Application |
| “CMP” or “Plaintiff” | CMP Development, LLP |
| DFF | Defendant’s Proposed Findings of Fact |
| FDA | Food and Drug Administration |
| NDA | New Drug Application |
| Op. | Plaintiff CMP Development, LLC’s Opening Post Trial Brief |
| Parent Patents | U.S. Patent Nos. 9,757,394 and 10,493,083 |
| PFF | Plaintiff’s Proposed Findings of Fact (DI 113) |
| POSA | Person of Ordinary Skill in the Art |
| Resp. | Defendant Amneal Pharmaceuticals LLC Responsive Post Trial Brief |
| Tragacanth | Tragacanth Powder |
| Xanthan | Xanthan Gum |

# I. INTRODUCTION

CMP respectfully submits that the complete trial record is quite different from the summary presented by Amneal in its Answering Post-Trial Brief.

The testimony at trial establishes that CMP met its burden of proof by means of all the fact and expert testimony presented at trial. The tragacanth used in Amneal's ANDA Product suspends spironolactone in the same way as xanthan, when mixed with the balance of all ingredients used in Amneal's ANDA Product to achieve the same result.

Dr. Jonnalagadda relied on his expertise as well as Amneal's documents, literature, and the analytical data arising from Amneal's own experimentation to support his opinion. Dr. Jonnalagadda did not offer any opinion based on a simple "prediction," and "confirmation" of that prediction. This rhetoric is nothing but spin, and such a straw man argument only confirms the strength of CMP's case.

# II. THE PROPOSED ANDA PRODUCT INFRINGES THE ASSERTED PATENTS

## A. Dr. Jonnalagadda's Opinions were Based on a Reliable Methodology Applied to Amneal's Analytical Data

The primary foundation upon which Dr. Jonnalagadda based his opinion concerning the way in which tragacanth increases viscosity in Amneal's ANDA Product is the experimental data reported by Amneal to the FDA, data itself that is founded upon reliable experimental evidence. (PFF 6-9.) Dr. Jonnalagadda's opinions, as well as the additional fact and expert testimony in the trial record, provide ample bases to determine that Amneal's ANDA Product infringes the Asserted Patents. *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248 (Fed. Cir. 2000) ("[T]his hypothetical [infringement] inquiry is properly grounded in the ANDA application and the extensive materials and specifications typically submitted in its support.")

Dr. Jonnalagadda, did not "predict" and simply "confirm" that tragacanth behaves in the same manner as xanthan. Dr. Jonnalagadda analyzed Amneal's experimental data to assess whether tragacanth works in the same way as xanthan in the suspensions under study. (PFF 80.) After evaluating Amneal's analytical documents, including the Product Development Report and the supporting lab notebook, Dr. Jonnalagadda determined that Amneal's suspension could not have the physicochemical properties it has without a suspending agent that has the same or substantially similar mechanism for suspending spironolactone in the suspension. (PFF 105-108.) He also testified that a battery of physicochemical properties of the Amneal suspension, confirmed by extensive experimental data, establish that tragacanth performs its function in the same way as xanthan. (PFF 80.) Dr. Jonnalagadda relied on Amneal's data showing that among the suspending agents Amneal tested, only tragacanth and xanthan prevented sedimentation after 7 days. (PFF 105.) When analyzing whether xanthan and tragacanth function in the same way in these suspensions, Dr. Jonnalagadda considered both their physical and chemical similarities, as well as their differences. (*See e.g.,* PFF 86 (citing 147:2-150:6); *see also,* PFF 81-87, 99, 108.)

This methodology, and Dr. Jonnalagadda's conclusion about the way in which tragacanth increases viscosity in Amneal's ANDA Product, is not predicated upon *ipse dixit* reasoning.

### B. Amneal Repeatedly Mischaracterizes the Record Concerning Dr. Jonnalagadda's Testimony

Amneal's attempts to undermine Dr. Jonnalagadda's methodology rely upon mischaracterizations of the record. These mischaracterizations are peppered throughout Amneal's briefing.

Amneal first offers a straw man argument that Dr. Jonnalagadda used a "prediction model" to come to his final conclusions that "tragacanth in the ANDA Product increased

viscosity in 'exactly the same way' as the xanthan gum of the claimed inventions." Resp. at 5-6, 7-10. But this was not Dr. Jonnalagadda's testimony. The record shows that none of the cited testimony supports Amneal's argument, when read in context. The "prediction" model, a theme repeated through Amneal's brief, does not pertain to the work Dr. Jonnalagadda performed relative to tragacanth and xanthan. Rather, that testimony was presented in the context of explaining his background experience with various other polymers, and how they perform with a given solvent. (*Compare* DFF 33 *with* Tr. (Dr. Jonnalagadda) at 177:5-25). Amneal's suggestion that Dr. Jonnalagadda did not produce papers with the type of computer models he had described is an admission that all of his opinions in this case were based on such computer modeling is simply false. (Compare DFF 35 *with* Tr. (Dr. Jonnalagadda) at 178:1-8.) The record shows that Dr. Jonnalagadda's opinion relies upon Amneal's experimental data, and upon his own expertise—it is not predicated upon a "prediction" and "confirmation," using any computer modeling technique, and it was not founded solely upon his say so.

Amneal's next unsubstantiated attack is to assert that Dr. Jonnalagadda testified that the bassorin component of tragacanth is a water-soluble hydrocolloid. Resp. at 6-7. Dr. Jonnalagadda did not so testify. His testimony was that tragacanth is a water-soluble hydrocolloid comprised of water-soluble tragacanthin, and the "less soluble portion," bassorin. (PFF 89.) Dr. Jonnalagadda did not testify that the bassorin portion of tragacanth is water soluble.

The evidence shows that the basis of Dr. Jonnalagadda's opinion concerning bassorin solubility is his experience with how water soluble and insoluble materials tend to behave. (*Id.*) This is consistent with Dr. Moreton's description in a textbook chapter he wrote in 2009 describing tragacanth as a water-soluble hydrocolloid. (Tr. (Dr. Moreton) at 294:11-18). He

also conceded (on cross) that his categorization of tragacanth as a water-soluble hydrocolloid in 2009 was based on prior published authorities listing known water-soluble hydrocolloids. (PFF 114)(Tr. (Dr. Moreton) at 336:8-11). Dr. Jonnalagadda's view as the relative solubility of tragacanth is entirely consistent with Dr. Moreton's textbook chapter, which was (itself) a summary of other literature references of the material. (*Id.*)

Finally, Amneal mischaracterizes Dr. Jonnalagadda's analysis of actual experimental data from Amneal's ANDA as an improper reliance on the efforts undertaken by Amneal to establish bioequivalence of its product to CaroSpir®. Resp. at 16. But Dr. Jonnalagadda offered no testimony concerning the bioequivalence of Amneal's ANDA Product as compared to CaroSpir®. Nor did CMP argue that its burden of infringement is satisfied through the bioequivalence of the two products. Instead, Dr. Jonnalagadda examined the physicochemical properties of the Amneal ANDA Product, including how tragacanth performed within that suspension, to determine whether tragacanth and xanthan increase viscosity in the same way. (PFF 107, 108.) Dr. Jonnalagadda's analysis of Amneal's experimental data provides direct experimental evidence of how tragacanth behaves in the accused suspension, which includes spironolactone and several additional ingredients.[1]

In contrast, Dr. Moreton's opinions concerning the way in which tragacanth functions in Amneal's ANDA Product are solely based on textbooks that describe how bassorin and tragacanthin behave in isolation—in water without spironolactone. (PFF 97.) Based on this textbook experimental information, Dr. Moreton simply ***infers*** the way that tragacanth used in

[1] Contrary to Amneal's representation, Dr. Jonnalagadda also knew that CaroSpir® and the ANDA Product used different buffers. (*Compare* Resp. at 10 *with* Tr. (Dr. Jonnalagadda) at 176:5-25.) CMP did not assert claims directed to the type of buffer Amneal used to simplify, and reduce, the number of claims asserted at trial.

Amneal's ANDA Product behaves. Dr. Moreton assumes the behavior of tragacanth in water (as reported in textbooks) establishes the way in which tragacanth must also behave in Amneal's ANDA Product. This despite conceding (on cross examination) that tragacanth behaves differently (*cf*. viscosity properties) depending on the presence of other ingredients with tragacanth in a suspension. (Tr. (Dr. Moreton) at 323:19-325:2; PFF 98.)

The trial record supports the conclusion that tragacanth is an equivalent of xanthan, when used in Amneal's ANDA product, because it increases viscosity in the same way that xanthan does—by random entanglement of polymer chains. The same record does not support the rhetorical spin Amneal presents in its Answering Post-Trial Brief, which primarily relies upon an inaccurate summary of Dr. Jonnalagadda's opinions to attack alleged opinions that Dr. Jonnalagadda did not in fact render.

### C. Dr. Jonnalagadda's Testimony Was Not the Only Evidence of Infringement

Dr. Jonnalagadda was not the only witness at trial who presented evidence supporting the conclusion that tragacanth increases viscosity in the same way as xanthan. Mr. Hardik Patel (Amneal's lead formulator) and Dr. Moreton (Amneal's expert) also presented ample confirming evidence supporting a finding, by a preponderance of the evidence, that tragacanth functions in the same way that xanthan does in the pharmaceutical suspensions at issue. (*See gen.* Op. at Sect. III.A)(pp. 4-12).

In particular, Dr. Moreton agreed that tragacanthin increases viscosity through random entanglement. (PFF 90, 91, 100.) Dr. Moreton also acknowledged the interchangeability of xanthan and tragacanth was known in the art at the time of invention. (PFF 85.) Amneal's post-trial efforts to minimize Dr. Moreton' concession is understandable, as its own expert proffered the textbook reference that confirms the interchangeability of the two suspending agents at trial:

> Q. I would like to look at JTX-70, please, JTX-70 you referred to on your direct[] examination. Do you remember that?
> **A. Yes, I do**.
> Q. This happens to be a reference of polysaccharides, food polysaccharides, right?
> **A. Correct.**
> Q. We're not dealing with food products in this case, right?
> **A. No, we're dealing with polysaccharides which are used in foods and pharmaceuticals.**
>
> . . .
>
> Q. They're talking about food products in salad dressings and sauces, right?
> ***A. Yes, they are, but it's still informative for pharmaceutical use.***
> Q. Okay. Under that logic, it also says that nowadays xanthan gum is commonly used instead as it is more readily available. And this whole paragraph is talking about tragacanth, right?
> **A. Yes.**
> Q. So xanthan gum nowadays, is the more common substitutes for tragacanth, would you agree?
> **A. I think I would agree with you, yes.**

(Tr. (Dr. Moreton) at 325:18-327:13 (emphasis added); *see also,* PFF 85.) Mr. Patel also testified that Amneal's ANDA Product was designed to match the physicochemical properties of CaroSpir®, including setting several physicochemical specifications including density, re-suspendability, sedimentation rate, and viscosity. (PFF 101.) CMP has shown by a preponderance of evidence that tragacanth and xanthan are interchangeable in pharmaceutical use, which also supports the conclusion that Amneal's ANDA Product infringes the Asserted Patents under the doctrine of equivalents.

### D. The Amount of Tragacanth Used By Amneal is Equivalent to the Claimed Amount of Xanthan

The testimony at trial was not ambiguous on this point: Amneal's scientists knew what they were doing when they designed their experiments to identify and select the suspending agent they used, because they chose parameters specific to the particular suspending agents being tested. (PFF 103.) Amneal's scientists began their work with tragacanth by using an increased amount of tragacanth as compared to the amount of xanthan used in CaroSpir®. (PFF 100.)

And, Amneal started with 0.7% w/v of tragacanth, which is about twice the amount of xanthan claimed in the Asserted Patents. (PFF 105.) Because 30-40% of tragacanth will be tragacanthin (the portion of tragacanth that indisputably increases viscosity through random entanglement) it is reasonable to conclude that it was necessary to increase the amount of tragacanth to impart an equivalent viscosity to its suspension. (PFF 90, 100.) In other words, 0.7% w/v tragacanth is equivalent to the claimed amount of xanthan in the claimed invention, because the increased amount is necessary to ensure enough tragacanthin is present to increase the viscosity through random entanglement to create an ANDA Product that has the same properties as CaroSpir®. (PFF 90, 100; Tr. (Dr. Moreton) at 329:14-330:23.)

## III. AMNEAL HAS NOT SHOWN THAT CMP IS BARRED FROM ASSERTING THE DOCTRINE OF EQUIVALENTS

### A. CMP Did Not Make Arguments During Prosecution That Clearly and Unmistakably Disavowed the Use of Tragacanth

Disclaimer through argument-based prosecution history estoppel must be "clear and unmistakable," and there was no evidence supporting a clear and unmistakable waiver of the use of other natural gums as a suspending agent on this record. *Conoco, Inc. v. Energy & Env't Int 'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006). Neither the facts, nor the law, support Amneal's position on this point.

Despite Amneal's suggestion to the contrary, CMP did not argue, at any point during prosecution, that its inventions did not include tragacanth or other natural gums. The primary arguments made during prosecution related to methylcellulose, not tragacanth or any other

natural gums. (PFF 124, 125.) No reasonable competitor[2] reading the prosecution record would understand that CMP had unequivocally disavowed all suspending agents equivalent to xanthan.

No argument made during prosecution discusses or distinguishes xanthan from tragacanth, or from other natural gums. Mr. Pipho's declaration does not name tragacanth, nor does it criticize natural gums. Mr. Pipho's declaration only contains his findings about the suspending agents he had tested and distinguishes the performance of his suspension in comparison to Olsen, which used methylcellulose as its suspending agent. (*See* DTX055.007). Mr. Pipho's declaration also does not disavow other natural gums, much less specifically disclaiming tragacanth. (*See* DTX055.) Indeed, Mr. Pipho could not have disclaimed other natural gum suspending agents because he had not tested such suspending agents in the suspensions he had developed at the time of invention. (*See* PFF 62.) Reading disclaimer into Mr. Pipho's silence about potential equivalent suspending agents that he had not tested would defy logic, and flatly contradict public policy. *See UCB, Inc. v. Watson Lab'ys Inc.*, 927 F.3d 1272, 1282 (Fed. Cir. 2019)(noting "as a policy matter" that the patent system should not incentivize inventors to claim equivalents they had not tested).

Amneal's reliance on *Amgen* is also misplaced. In *Amgen,* the applicant distinguished prior art by stating the invention relied on a "particular" combination of salts—sulfate/citrate and/or sulfate/acetate—as "particular dual salt combinations." *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1160 (Fed. Cir. 2019). The Federal Circuit found that this emphasis on a particular combination of salts resulted in a waiver of all unclaimed salt combinations. *See id.* By stating that these "particular" salts were advantageous over other salt

[2] Here, Amneal, the only competitor, did not even consider the Asserted Patents when developing its infringing product. (PFF 134.) There was no evidence at trial suggesting Amneal's formulation scientists had reviewed the prosecution histories either.

combinations, the inventors in *Amgen* waived other salt categories. *See id.* In contrast, CMP never stated that xanthan provided an advantage over all other suspending agents—CMP's discussion of xanthan was limited to its performance characteristics in comparison with methylcellulose. At no point did CMP argue that xanthan was a "particular" suspending agent or a particular natural gum that provided an advantage over all other possible suspending agents in the prior art. Thus, *Amgen* is inapposite to the facts here.

Finally, despite Amneal's representations to the contrary, CMP presented evidence that the arguments made during prosecution history would not result in waiver. Dr. Jonnalagadda testified that there was no criticism of natural gums during prosecution. (PFF 135.) In addition, on cross examination, Dr. Jonnalagadda testified that CMP's arguments about *Quagliano* did not affect his opinion regarding the prosecution history's effect on tragacanth. (Tr. (Dr. Jonnalagadda) at 184:12-19.) Finally, as discussed above, Mr. Pipho's declaration is not evidence that CMP disclaimed tragacanth because there is no evidence in this record that Mr. Pipho (or anyone at CMP) had experimented with any other natural gums—much less tragacanth—before filing the Asserted Patents. (PFF 137.) CMP is not estopped from asserting the doctrine of equivalents on the facts before this Court.

**B. The Asserted Claims Were Not Drafted Narrowly to Exclude Tragacanth**

Amneal's narrow claiming argument relies upon an inaccurate recitation of the facts of this case so that they may seem to align with the *Wrigley* decision and avoid the holding of the later-decided *UCB v. Watson* case. Resp. at 21. This argument also is simply not supported by the evidence in the trial record.

Amneal's argument boils down to the proposition that where a patentee is simply found to be "on notice" of an equivalent at some point during prosecution, narrow claiming automatically occurs. Resp. at 22. This is not the law. The Asserted Patents stem from

continuation applications that claim priority back to U.S. Patent Application No. 15/665,014, filed on July 31, 2017. (JTX-1 at p. 2; JTX-2 at p. 2; JTX-3 at p. 2)(listing the "Related U.S. Application Data" for each respective patent in suit and listing the '014 application as the priority application). Amneal's "on notice" argument relies on information that occurred about two years after the common disclosure of the Asserted Patents was filed with the patent office. (Resp. at 26.) Specifically, Amneal relies on CMP's September 2019 statements quoting a portion of *Quagliano* to the patent office, in response to an office action[3] arising during prosecution of claims that (eventually) issued in the parent '083 patent. (JTX-5 at 443)(block quoting a portion of *Quagliano* that includes tragacanth gum among a list of 26 "artificial or natural hydrocolloid gums").

On the actual trial record, the evidence is that Mr. Pipho had not tested, and was not aware of, the use of other natural gums that would suspend spironolactone particles in a spironolactone suspension before the common specification was filed in July of 2017. (PFF 62.) Nor does any evidence suggest that Mr. Pipho was told (or was even generally aware) of the use of other natural gums (in any amount) in a pharmaceutical suspension before the common specification was filed. And there was absolutely no evidence in this record that Mr. Pipho was introduced to tragacanth by a salesman of suspending agents at any time during prosecution of the patents in suit, much less before the parent application was filed.

These facts simply do not align with the facts of *Wrigley*. At best, the existence of the long list of "artificial or natural" suspending agents recited in *Quagliano* (and repeated by counsel in an office action) establishes notice of the possibility of many other equivalents that

---

[3] The examiner in the parent application considered *Quagliano* and found it "provides no motivation for using [xanthan gum] in a composition with spironolactone, especially given the formulation difficulties associated with this drug, . . ." (PFF 130; JTX-5 at 534.)

may (or may not) adequately suspend spironolactone particles in a pharmaceutical suspension. This is a far cry from facts establishing actual knowledge of a potential equivalent, which could (in theory) give rise to reasonable reliance by a competitor that the potential equivalent was surrendered by narrow claiming before the filing date of the application.

The *UCB* court could not be more clear that the patent system "should not incentivize inventors to claim equivalents that **they had not invented or tested**, just because they know of the possibility of an equivalent, and also should not force inventors to delay in filing for a patent on what they have invented while testing all known possible equivalents for fear of being unable to assert infringement under the doctrine of equivalents in the future." *UCB,* 927 F.3d at 1282 (emphasis added). Amneal invites this Court to flatly contradict the holding of *UCB v Watson* by finding that narrow claiming precludes the application of the doctrine of equivalence on this trial record. Respectfully, the Court should reject Amneal's invitation.

### C. Ample Evidence Rebuts Amneal's Ensnarement Theory

Amneal's theory of ensnarement continues to evolve. In its portion of the Pretrial Order, Amneal argued a lack of patentability of the hypothetical claims, premised upon the assertion that the "ready to use" preambles are not limiting, and the "wherein" clauses do not hold any patentable weight. DI 99 at Ex. 5, p. 8. Amneal proclaimed that "CMP acquiesced" to two rejections from the patent office on these grounds. DI 99 at Ex. 5, p. 9 (noting the rejections and incorrectly asserting that "CMP acquiesced.") Ignoring that Amneal's *Peterson* utilizes tragacanth in an amount that exceeds the Parties' respective hypothetical claims (PFF at 143), Amneal erroneously asserted that *Peterson* inherently anticipates a hypothetical claim by assuming that the "ready to use" preamble to be non-limiting and the wherein clauses to lack any patentable weight. *Id*.

Notwithstanding the different tragacanth amounts, Amneal's first theory could not be sustained at trial, because the evidence was clear that (during prosecution) CMP had never acquiesced to the examiner's rejections. In truth, the examiner found the claims under examination to be patentable, accepting CMP's arguments about why the "ready-to-use" preamble is limiting, and wherein clauses impart patentability to the claims. (PFF 126-127, 129.) And, Amneal's *Peterson* did not, by any stretch of the imagination, disclose a ready to use, shelf stable, easily resuspendable, spironolactone suspension. (PFF 126-131.)

At closing (and in its post-trial brief) Amneal's theory is that the hypothetical claims are "obvious" over *Peterson* in view of *Pramar*. Resp. at 23-24. Amneal is correct to note that Dr. Jonnalagadda offered testimony that both *Peterson* and *Pramar* taught away from the claimed invention. (PFF 142, 146.) This evidence alone would provide a sufficient basis for finding that the hypothetical claims to be patentable over the allegedly ensnared prior art put forth by Amneal. *See Depuy*, 567 F.3d at 1326-7.

Dr. Jonnalagadda's opinions, however, were not the sole evidence in this record establishing patentability of the hypothetical claims. The undisputed evidence at trial also establishes that CaroSpir® was the first, and remains the only, FDA-approved ready-to-use oral suspension with spironolactone, commercially available in 4 oz (118 mL) or 16 oz (473 mL) amber polyethylene terephthalate ("PETE") bottles. (PFF 57.) The undisputed evidence at trial also established that many skilled artisans had tried, since 1960, and failed to make such a suspension. (*Id*. at 56.) And all the testifying witnesses at this trial agreed that formulating shelf-stable, easily resuspendable liquid formulations is a challenging task. (PFF 49-50, 132, 142, 147.) Mr. Moreton also admitted that *Pramar* taught away from using suspensions. (PFF 146.)

In one final volley of its ill-conceived ensnarement theory, Amneal now presents post-trial arguments concerning how the hypothetical claims should be construed.[4] First, the hypothetical claims are distinguishable from the claims at issue in *Amgen* because the hypothetical claims at issue here do not involve *Markush* groups. *See Amgen Inc. v. Amneal Pharms. LLC,* 945 F.3d 1368, 1379 (Fed. Cir. 2020). Second, as Dr. Moreton admitted, the amount of tragacanth in *Peterson* is outside the range of tragacanth in the hypothetical claims. (PFF 143.) Dr. Moreton provided no testimony as to why a POSA would be motivated to reduce the amount of tragacanth recited in the hypothetical claim. Here, the language of the hypothetical claim also explicitly excludes suspending agents that are not natural gums by use of the term "consisting" in the suspending agent limitation.

Amneal's new claim construction argument essentially reads "consisting of" out of that element of the hypothetical claim or inappropriately construes it as a *Markush* group. The "consisting of" term is there for a reason—the hypothetical claim precludes the use of additional suspending agents. *See Amgen Inc. v. Amneal Pharms. LLC,* 945 F.3d 1368, 1379 (Fed. Cir. 2020) (noting a claim can be drafted such that "consisting of" will still be limiting when embedded under a comprising preamble). To the extent it is unclear from the language of the hypothetical claim, the inquiry here is whether a hypothetical claim can be drafted that does not ensnare prior art. Such a hypothetical claim clearly can, and has been, drafted.

---

[4] At some point, Amneal's shifting sands defenses should be addressed. In its Notice Letter, and in its contentions in this case, Amneal set forth a detailed substantive invalidity defense. The contentions included 14 prior art references (not including *Peterson)*, and 70 pages of accompanying contentions. Its Notice Letter and its non-infringement contentions did not include an ensnarement defense, which appeared only when expert reports were served. Amneal abandoned its invalidity defense, however, by not proffering any expert opinion in support of those theories. *See Takeda Chem. v. Mylan Labs, Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008).

As a factual matter, Dr. Moreton did not offer rebuttal testimony refuting the fact that several excipients in the Aldactone® tablets are suspending agents, and are not natural gums. (Tr. (Dr. Moreton) at 282:17-24.) For these reasons, Amneal's attempt to render the hypothetical claims obvious through a post-trial claim construction of CMP's proffered hypothetical claim must also fail.

Finally, Amneal dismisses evidence of secondary considerations by arguing that 1) secondary considerations are not appropriate in an ensnarement analysis and 2) only experts can present evidence of secondary considerations. Both premises are not correct. First, it is a basic tenet of an ensnarement analysis that evidence of secondary considerations is relevant. *DePuy*, 567 F.3d at 1324. Second, there is no requirement that evidence of secondary considerations must only be presented by expert testimony. *See e.g.*, *Impax Labs., Inc. v. Lannett Holdings Inc.*, 246 F. Supp. 3d 1024, 1039-40 (D.Del. Mar. 29, 2017) (finding a license agreement was proof of secondary considerations "[w]ithout expert testimony or profit data"). Finally, Amneal fails to address any of the evidence itself, whether presented by Dr. Jonnalagadda, Mr. Pipho, Mr. Patel, or even its own expert, Dr. Moreton, as follows:

> Q. Right. And let's look at JTX-73. JTX-73. This is a publication from somebody named Rachel Meyers. And you're familiar with this, right? Dr. Kamal cited this in his reply report?
> **A. Yes.**
>
> . . .
>
> Q. Would you agree with me, Dr. Moreton, that it would appear that the spironolactone approval, the CaroSpir approval sought the need identified in the Pramar article that would allow for this to be used with both adults and children?
> **A. It appears so, yes.**

(Tr. (Dr. Moreton) 355:6-357:20; *see also,* PFF 66, 149.[5]). The evidence shows that CaroSpir® was the first liquid ready-to-use dosage form of spironolactone, which met a decades-long felt

[5] CMP's proposed finding of facts contains a typo in PFF 66, the exhibit is JTX-73 (not JTX-23).

need. (PFF 57, 149.) Amneal offered no testimony or evidence rebutting the evidence of these secondary considerations. And, ensnarement cannot be used as a backdoor into an invalidity defense, which Amneal did not raise independently. *See Jang v. Boston Sci. Corp.*, 872 F.3d 1275, 1288–89 (Fed. Cir. 2017) (finding that repackaged invalidity arguments in the guise of an ensnarement defense unpersuasive because "ensnarement concerns patentability with respect to a hypothetical patent claim as opposed to the validity of an actual patent claim.") Thus, there is overwhelming evidence that CMP established the hypothetical claims to be patentable, which is confirmed (many times over) by ample secondary considerations of non-obviousness in the trial record. (*See gen.* Op. at Sect. III.C.3)(p. 23-24). For these reasons, Amneal has not shown that CMP is barred from asserting its doctrine of equivalents theory based on ensnarement.

## IV. CONCLUSION

The record at trial speaks for itself. CMP has established, by a preponderance of evidence, that the tragacanth used in Amneal's ANDA Product suspends spironolactone particles in the same way as xanthan—by random entanglement of polymer chains in its solution. Tragacanth is an equivalent of xanthan when incorporated into Amneal's ANDA Product, and that product infringes the Asserted Claims of the Asserted Patents under the doctrine of equivalents. There is no legal basis to preclude application of the doctrine of equivalents as a matter of law on this trial record. The Court should therefore find that Amneal's ANDA Product, if approved by the FDA, will infringe the Asserted Claims of the Asserted Patents, and grant CMP the relief it seeks, as set forth in the Pretrial Order (DI 99) at Ex. 2, p. 6).

OF COUNSEL:

Christopher J. Sorenson
Paige Stradley
MERCHANT & GOULD PC
150 South Fifth St., Suite 2200
Minneapolis, MN 55402
(612) 332-5300

Andrew O. Larsen
MERCHANT & GOULD PC
767 Third Avenue, Suite 23C
New York, NY 10017
(212) 223-6520

Dated: March 13, 2023

*_/s/ Kelly E. Farnan_*
Kelly E. Farnan (#4395)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
cragg@rlf.com

*Attorneys for Plaintiff*
*CMP Development, LLC*